**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| WENDELL NEUBERT, | ) | CASE NO. 5:13-cv-643 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| LIFE INSURANCE COMPANY OF | ) | |
| NORTH AMERICA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

This matter is before the Court on cross-motions for judgment on the administrative record filed by plaintiff Wendell Neubert ("Neubert") and defendant Life Insurance Company of North America ("LINA"). (Doc. Nos. 23 and 24, respectively.) The parties have filed opposition briefs and reply briefs (Doc. Nos. 25, 26, 27, 28), and the matter is ripe for disposition.

I.  Factual and Procedural Background

In this case, Neubert again seeks reinstatement of long term disability ("LTD") benefits. Plaintiff sought the same relief in a 2010 case before this Court, *Neubert v. Life Ins. Co. of N. Am.*, No. 5:10CV1972, 2012 WL 776992, at *22 (N.D. Ohio Mar. 8, 2012), and the Court remanded the LTD benefits claim to LINA for a full and fair review.

A.  The Plan

Until 2006, plaintiff worked as an engineer for Lockheed Martin Corporation, where he participated in the company's Long Term Disability Group Insurance Plan ("the Plan").

(Doc. No. 24-1 at 1291; *see also* Administrative Record [AR], Doc. No. 16 at 1192-1216.[1]) Under the Plan, a claimant is disabled if, "because of Injury or Sickness, [the claimant is] unable to perform each and every material duty of [the claimant's] regular occupation." (AR at 1200.) After LINA pays twenty-four months of LTD benefits, a claimant qualifies as disabled under the Plan only if the claimant's "Injury or Sickness makes [the claimant] unable to perform all the material duties of *any* occupation for which [the claimant] may reasonably become qualified based on education, training or experience." (*Id.* (emphasis added).) The claimant must provide "satisfactory proof" of disability before benefits are paid and must further provide "continued proof of [the] Disability" for benefits to continue. (*Id.* at 1203.)

Benefits terminate under the Plan when the claimant earns more than 80% of the claimant's covered earnings,[2] when the claimant returns to active service, when LINA determines that the claimant is no longer disabled, when the maximum benefit period ends, or when the claimant dies. (AR at 1203.) The Plan also contains a mental illness, alcoholism, and drug abuse limitation. Once LINA has paid twenty-four monthly benefits, a claimant will not receive any further benefits if his or her disability is caused by or contributed to by, among others, anxiety disorders, depressive disorders, or mental illness. (*Id.*)

Under the Plan terms, the plan administrator—Lockheed Martin—appointed LINA as the named fiduciary for adjudicating claims and appeals for benefits under the Plan. (AR at 1213.) Further, the plan administrator has given LINA "the authority, in its discretion, to

---

[1] The Court's Initial Standing Order quite clearly instructs the parties to cite to the record using the "Page ID #" provided in the upper right corner of every document in the electronic case record. (Doc. No. 3 at 14.) Instead of following these explicit instructions, the parties created their own pagination for the Administrative Record and cited thereto. The parties are hereby cautioned to carefully read and review the Court's orders.

[2] Covered earnings are defined as the "annual wage or salary as reported by [the] Employer for work performed for [the] Employer." (AR at 1200.)

interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact." (*Id.*)

B.  Claim Denial and the 2010 Lawsuit

Plaintiff's claim for LTD benefits under the Plan first came before this Court in 2010. In a memorandum opinion and order denying LINA's motion for judgment on the administrative record and granting in part plaintiff's motion for same, the Court provided a detailed account of plaintiff's treatment and receipt of LTD benefits. The Court reproduces relevant portions of its opinion below:

> On March 24, 2006, Neubert suffered a stroke and was unable to continue working for Lockheed. (AR 3, 15.) On April 10, 2006, Neubert suffered a second stroke. (AR 15, 313.) On July 25, 2006, Neubert tried to return to work part-time without success due to self-reported stress, anxiety, an inability to concentrate or multitask, memory problems, fine motor difficulty and sensitivity to noise. (AR 345, 403.)
>
> On July 31, 2006, Neubert applied for disability benefits from the Plan. (AR 962.)
> \*\*\*
> On November 7, 2006, LINA approved Neubert for LTD benefits retroactive to October 10, 2006. (AR 230.) Neubert continued to see a neurologist after he received LTD benefits. (AR 312.)
> \*\*\*
> On April 28, 2008, LINA sent Neubert a letter notifying him that it had begun a review of his file to determine his continued eligibility to receive LTD benefits after October 10, 2008, the date upon which the definition of disability applicable to his claims would change. (AR180-81.) LINA requested updated information from Neubert and his treating physicians and indicated that upon receipt of the information, it would compare his restrictions and limitations to his training, education, and work experience. (*Id.*)
> \*\*\*
> On May 15, 2008, Neubert completed a Disability Questionnaire, stating that the primary physical or mental conditions preventing him from working were an inability to focus, burning pain in his arm and leg, fatigue and lack of stamina, neck pain, stress, and memory problems, all because of "permanent stroke damage." (AR 843-47.) He reported the following regular activities: a half hour of cooking a day, one to two hours of shopping once a week, fifteen minutes of laundry twice a month, one to two hours of gardening or yard work twice a week,

3

walking on the treadmill or lifting weights three to four times a week, and watching television three to four hours a day. (*Id.*) He stated that he did not engage in outside activities and was mostly house bound with the exception of walking a half-mile for twenty minutes four times a week. (*Id.*)

On September 24, 2008, Neubert's primary care physician, Dr. Elizabeth M. Salay, completed an Attending Physician's Statement of Disability ("PSD"). (AR 824.) Dr. Salay reported that she began treating Neubert in March 2006 and that she saw him four times a year. (*Id.*) The PSD noted a diagnosis of hemiparesis, vertebral artery dissection, and history of stroke without residual deficits. (*Id.*) The reported subjective symptoms were weakness and memory disturbance. (*Id.*) The PSD noted that Neubert's progress was unchanged and that, "he has had maximal therapy for his medical illness." (*Id.*) In the prognosis section, Dr. Salay indicated that Neubert was totally disabled from any work due to impaired fine motor skills, memory and word finding problems, and balance problems. (*Id.*) She stated that she did not expect his condition to improve in the future, nor did she expect that he would be capable of working any job in the future because the symptoms from his previous stroke were "not likely to resolve." (*Id.*) Dr. Salay also noted that Neubert was not a suitable candidate for medical rehabilitation, that no job modifications would enable him to work with his impairment, and she recommended against vocational counseling and/or retraining. (*Id.*)
***

On November 19, 2008, Neubert saw Dr. Dipti Shah, his new primary care physician. (AR 401.) Dr. Shah's examination notes indicate that Neubert reported residual symptoms from his previous strokes, including weakness, burning in his right arm and leg, fine motor skill difficulties, trouble concentrating, anxiety, limited cognitive function and memory problems. (AR 403.) He opined that Neubert was permanently disabled. (*Id.*) Dr. Shah's primary diagnosis of Neubert was cerebrovascular accident with residual cognitive deficit. (AR 404.)

On November 20, 2008, Dr. Shah submitted a PSD form (AR 736-37) to LINA, which was later updated by a Physical Ability Assessment form ("PAA") (AR 703-04). Dr. Shah indicated in the PSD that he took over treatment of Neubert from Dr. Salay on November 19, 2008. (AR 736.) The PSD noted diagnoses of stroke, Type 2 diabetes mellitus, hemiparesis, hyperlipidemia and hypertension. (*Id.*) Dr. Shah reported Neubert's subjective symptoms to be residual weakness, burning in his right leg and arm, and memory problems. (*Id.*) The PSD also noted: "patient has cognitive function." (*Id.*) The response to the objective findings section of the PSD was marked, "NA." (*Id.*) Finally, in the remarks section, Dr. Shah noted: "patient is totally disabled." (AR 737.)

Dr. Shah's PAA, which updated the PSD, indicated that Neubert can frequently sit, reach, grasp, lift 10 to 20 lbs., carry 10 lbs., push 25 lbs., pull 25 lbs., and can occasionally stand, walk, use fine manipulation, lift 21 to 100 lbs.,

carry 11 to 100 lbs., climb stairs, stoop, kneel, crouch, crawl, and has difficulty with fine motor activities, balancing, working extended shifts, using his feet for foot controls, and cannot work around machinery. (AR 707-08.) Dr. Shah noted that "patient has more problems with cognitive ability than physical ability because of stoke." (*Id*.)

On January 12, 2009, at the request of LINA, Neubert underwent an independent neuropsychological evaluation with a neuropsychologist, Dr. Thomas Swales. (AR 712-25.) Dr. Swales interviewed Neubert and reviewed his laboratory reports and medical records, including the treatment notes and physician statements from his doctors. (*Id*.) Neubert described to Dr. Swales that he suffered from burning pain in his right leg, an inability to feel temperature, neck pain, fatigue, difficulty focusing, stress, anxiety, and an inability to multitask. (AR 714.) The report stated that, during the interview, Neubert described himself as "a workaholic" and described his daily activities since leaving his job due to his strokes, including mowing his lawn, gardening, having dinner with friends or family once a month, and spending most of his time playing "World of Warcraft." (AR 713-15.) According to Dr. Swales's report, "He reportedly shoots a button over and over in a repetitive action," and Neubert told him, "I talk to people on a headset. I get a sense of accomplishment." (AR 715.)

Dr. Swales administered a battery of tests to evaluate Neubert's cognitive function. Of the intelligence testing, Dr. Swales noted that Neubert scored in the ninth percentile on the coding subtest, which he characterized as Neubert's "worst performance, in the borderline range, [...] which reflects a slow speed of rapid copying of symbols paired with numbers." (AR 720.) Dr. Swales concluded that Neubert's memory and spatial skills were in the very superior range; his verbal and nonverbal intelligence, confrontational word naming, working memory, and list learning were in the high average range; and his attention/vigilance, frontal systems, memory for stories, nonverbal memory and speed visual-motor processing were in the average range. (AR 722.) Of the motor skills testing, Dr. Swales found that Neubert's fine motor coordination and grip strength were uniformly in the low average range in his dominant hand, most likely due to "some residual weakness" because of his stroke. (AR 721.) The results of emotional testing revealed that Neubert was experiencing mild to moderate emotional distress characterized by tension, anxiety, and dysphoria. (*Id*.) Dr. Swales's report indicated that Neubert put forth adequate cooperation and effort throughout the tests and that there was no indication of malingering. (AR 719, 721.)

Based on his examination of Neubert, Dr. Swales concluded that Neubert was free of cognitive disorders and performed in the average to high average range in cognitive functioning. (AR 722.) The only meaningful finding, according to Dr. Swales, was that Neubert's fine motor coordination and grip strength were in the low average range in his dominant hand, which Dr. Swales concluded

5

correlated with his history of stroke. (*Id.*) In Dr. Swales's opinion, Neubert's "primary problems appear to be affective (psychiatric in nature) in that he is struggling with anxiety, characteristic of a generalized anxiety disorder," but he also opined that "the intensification of anxiety following his stroke would indicate that it is possible there may be also some organically-based component to his anxiety, as a consequence of his cerebellar stroke." (AR 724.) He concluded, further, that "[Neubert's] cognitive complaints appear to be the product of anxiety, rather than true cognitive impairment. Overall, his cognitive capacity appears at the best estimated level of his prior premorbid functioning while working, based upon his performance on a variety of cognitive measures in this neuropsychological evaluation." (AR 725.) According to Dr. Swales, Neubert "appears free of any cognitive impairment currently that would preclude a return to gainful employment." (AR 724.)

On February 19, 2009, LINA's vocational department completed a Transferrable Skills Analysis ("TSA"). (AR 699.) LINA noted that Neubert's past work experience was as a senior staff project engineer and identified his annual salary as $96,669. (*Id.*) The TSA designates a wage requirement of $58,001.40, which the parties agree represents 60% of Neubert's past salary. (*Id.*) According to the TSA, the restrictions identified by Dr. Shah were as follows:

> Occasionally: lift 21-100 pounds, carry 21-100 pounds, fine manipulation bilaterally, stand, walk, climb stairs, stoop, kneel, crouch, crawl, exposure to extremes in heat and cold, exposure to wet and humid conditions, exposure to vibration, exposure to odors, fumes and particles; (2) Frequently: sit, reach in all directions, simple grasping bilaterally, firm grasping bilaterally, lift 20 pounds, carry 20 pounds, push 25 pounds, pull 25 pounds; (3) Continuously: see, hear, smell, taste; and (4) Unable: work around machinery.

(*Id.*) The TSA noted that Dr. Shah observed that Neubert "has more problems with cognitive ability than physical ability because of stroke." (*Id.*) Based on Neubert's work history, his skills and abilities, and the wage requirement, without consideration of any cognitive deficits, the TSA identified the following 'light duty' occupations: (1) sales engineer, aeronautical products; (2) project engineer; and (3) production planner. (AR 700.)

The same day that LINA completed its TSA, it issued a denial letter to Neubert terminating his LTD benefits. (AR 162.) The letter set forth the Plan's definition of disability and outlined the information that LINA reviewed. (*Id.*) First, the letter cited Dr. Shah's PAA form completed November 26, 2008, noting that Neubert had more trouble with his cognitive ability than his physical ability. (AR 163.) The letter also summarized Dr. Swales's report, stating that he had not found "any major cognitive limitations or impairments that would be sufficient to

6

remove or preclude the option of returning to gainful employment[.]" (*Id.*) Next, the letter cited the TSA, which LINA stated identified occupations comparable with Neubert's work capacity and that satisfy the earnings requirement for his indexed covered earnings under the Plan. (*Id.*) The letter then outlined the appeal procedures applicable to the denial of benefits. (AR 163-64.)

On August 7, 2009, Neubert appealed LINA's denial of LTD benefits. (AR 749.) LINA sent Neubert's counsel a letter acknowledging the appeal and requesting any additional information that would influence the appeal decision. (AR 160-61.) Neubert subsequently submitted additional medical records.

Included in the additional information provided was information relating to a March 20, 2009 general neurology follow-up Neubert had with Dr. Karla J. Madalin. (AR 381.) The subjective part of Dr. Madalin's exam findings indicated that Neubert was experiencing severe pain in his right leg and the right side of his neck, difficulty focusing and multi-tasking, increased fatigue, confusion, and slowness of thinking. (AR 384.) Her objective medical findings indicated that Neubert's recent and remote memory was intact, his fund of knowledge was normal, his attention span and concentration normal and he had decreased sensitivity in his right extremities. (AR 390-91.) Dr. Madalin diagnosed Neubert as follows: (1) thalamic syndrome, noting that the "significant discomfort" and pain in his right arm and leg were due to his previous strokes; (2) stroke with residual cognitive deficit, noting that he had residual right hemisensory deficit and neurogenic pain; (3) hemiparesis, noting a right hemisensory deficit from his previous strokes; (4) vertebral artery dissection, noting a stable occlusion of the left vertebral artery. (AR 391-92.) She concluded that there was no "objective test to determine the cause of [Neubert's] inability to work," and she stated she believed "that as a consequence of [his] stroke, [he was] unable to work in [his] previous job or any job." (AR 392.)

Information was also provided regarding an April 7, 2009 follow-up exam that Neubert had with Dr. Shah. (AR 375.) Neubert complained that his right foot had turned red and blue for the past two years, and that he was experiencing burning pain on his right side. (AR 377.) Dr. Shah's objective findings noted that Neubert spoke fast and was very anxious; his right foot was red/blue; no acute neuro deficits; equal bilateral strength; and impaired fine motorskills. (AR 378.) She diagnosed Neubert with hypertension, stroke with residual cognitive deficit, hyperlipidemia, thromboangiitis obliterans, anxiety disorder, Type II diabetes, contolled, hemiparesis, vertebral artery dissection, and pulmonary nodule. (AR 378-79.) She indicated that she was referring Neubert to the vascular surgery department. (AR 379.)

Information was also provided regarding an August 24, 2009 neuropsychological evaluation performed by Harold S. Schaus, Jr., M.S., DAPA. (AR 252.) Mr. Schaus indicates in his report that he reviewed Neubert's medical

records, his job description and Dr. Swales's neuropsychological evaluation. (*Id.*) After reviewing Neubert's background, Mr. Schaus was critical of Dr. Swales's report, indicating that it lacked testing of divided attention, "or being able to keep more than one thing in mind at a time." (AR 253.) Mr. Schaus's report states that, "[t]his aspect of attention is crucial in assessing [Neubert's] complaints about troubles multitasking, and is one of the most common deficits anytime there has been an insult to cortical tissue." (*Id.*) Mr. Schaus selected tests based on this observation and Neubert's complaints about intolerance to noise and anxiety. (*Id.*)

Mr. Schaus's report indicates that cognitive deficits were evidenced by the results of two tests: the Paced Auditory Serial Addition Test (PASAT) and the Integrated Variables of Attention (IVA), which assess multitasking and auditory functioning. (AR 255.) On the four series in the PASAT, Neubert scored in the 9th, 21st, 24th, and 13th percentiles respectively. (AR 254.) On the IVA, Neubert performed in the average range on the visual subtests, but Mr. Schaus noted that he had "significant problems" with the auditory portion. (*Id.*) Mr. Schaus stated: "There is no question about some cognitive deficits given the results of the PASAT and the IVA. These cognitive deficits alone would make it unlikely that Mr. Neubert could adequately perform his former job." (AR 255.) Mr. Schaus observed that Neubert's cognitive deficits were compounded by emotional factors. (*Id.*)

Based on these findings, Mr. Schaus diagnosed Neubert with generalized anxiety disorder, adjustment disorder with depressed mood, dependent personality traits, schizoid personality traits, avoidant personality features, obsessive compulsive personality features, cognitive disorder (not otherwise specified), illness or fatigue, moodiness, and a GAF score of 70. (AR 255-56.) He found no evidence of malingering and concluded:

> Mr. Neubert is unable to return to his previous job or one approximating the level of difficulty required on his former job. The cognitive deficits alone make it unlikely that he could resume his previous employment. Add the emotional problems and it is a real long shot that he could resume his duties at Lockheed.

(AR 256.)

On September 22, 2009, LINA notified Neubert by letter that it had determined that it would need two Independent Peer Reviews in order to evaluate Neubert's disability claim. (AR 155.) On October 8, 2009, Dr. Linda Miller, an internist, completed a file review at the request of LINA. (AR 470.) She concluded that the medical information provided did not show any measured limitations that would support off work restrictions from February 20, 2009 onward. (AR 476.) Dr. Miller states that, "Numerous clinic visits state that [Neubert] has no residual from [his strokes] except possible patchy decreased

sensation in the right [arm] and complaints of burning pain on the right. There are no measured limitations on any of his physical exams." (*Id.*) Dr. Miller indicated that she did not evaluate Neubert's cognitive or psychiatric complaints because that was not her area of expertise. (AR 477.) Finally, she noted that she spoke with Neubert's treating physician, Dr. Shah, who, according to Dr. Miller, indicated that Neubert had no physical limitations or restrictions, but was unable to work due to anxiety and problems with comprehension. (*Id.*)

On November 12, 2009, at the request of LINA, Dr. Elana Mendelssohn, Psy. D., completed a file review. (AR 462.) She opined that "the provided clinical information both based on review of documentation and a peer-to-peer consultation did not support the presence of a functional impairment from a neuropsychological perspective nor does this information support off-work restrictions by the measured limitations from 02/20/2009 forward." (AR 465.) Dr. Mendelssohn reported that she spoke with Neubert's treating physician, Dr. Shah, and stated that Dr. Shah "was unable to provide [a] specific description of overt cognitive difficulties[,]" and that Dr. Shah "noted the claimant's report of multiple cognitive problems and that the claimant tended to present as anxious with fast speech." (AR 465.) Dr. Mendelssohn found that the records "did not include [a] clear description of direct and observed behaviors to corroborate" Neubert's claimed impairments. (*Id.*) Further, she disagreed with Mr. Schaus's report and indicated that Neubert's performance on the tests administered by Mr. Schaus "did not substantiate the claimant suffers from global impairment in neuropsychological functioning." (*Id.*)

In the meantime, on October 22, 2009, Neubert was awarded Social Security disability benefits. (AR 590.) The ALJ found that Neubert was disabled since March 23, 2006 due to severe impairments; specifically, post left cerebellar and left medullary stroke and the effects thereof. (AR 596.) This "medically determinable impairment," as found by the ALJ, equals listing 12.02. (*Id.*) The ALJ concluded that Neubert's "impairments could reasonably be expected to produce the alleged symptoms," and his "statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible." (*Id.*) Neubert notified LINA of the SSA award.

On November 23, 2009, LINA issued its second denial letter to Neubert affirming its earlier decision to terminate his LTD benefits. (AR 150.)
***
On February 1, 2010, Neubert appealed LINA's second denial. (AR 455.)
***
On June 16, 2010, LINA issued its third and final denial letter of Neubert's claim for LTD benefits. (AR 142.)
***
On September 3, 2010, Neubert filed this action for wrongful denial of benefits.

*Neubert v. Life Ins. Co. of N. Am.*, No. 5:10CV1972, 2012 WL 776992, at *2-10 (N.D. Ohio Mar. 8, 2012) (footnote omitted).

After the parties filed cross-motions for judgment on the administrative record in the 2010 case, the Court granted plaintiff's motion in part and denied defendant's motion. It remanded plaintiff's claim for LTD benefits to LINA for a full and fair review.

The Court identified the following errors in LINA's benefits denials: (1) LINA failed to explain why it adopted Dr. Swales's opinion over Neubert's treating physicians, who each opined that Neubert was permanently disabled; (2) LINA's benefits denial occurred the same day it received plaintiff's vocational review, indicating that LINA had made up its mind before receiving the review; (3) the vocational review improperly used a 60% wage requirement, which did not appear in the plan provisions; (4) the vocational review failed to explain its basis for rejecting Neubert's treating physicians' descriptions of his limitations; (5) LINA's file review prior to its second denial of benefits contradicted plaintiff's treating physicians as to plaintiff's physical and neuropsychological conditions and did not explain these discrepancies; (6) Dr. Mendelssohn, whom insurance companies frequently employed as a consultant, reviewed Neubert's file using a "global impairment" standard not defined in the benefits plan; (7) LINA did not consider Neubert's benefits award from the Social Security Administration (SSA) before issuing the second denial of benefits; and (8) LINA's third denial of benefits suffered from the same deficiencies described above. *Neubert*, 2012 WL 776992 at *13-21.

C.  Proceedings on Remand

LINA conducted another review of Neubert's claim for disability benefits after remand. Dr. Swales, who had previously conducted a neuropsychological evaluation of Neubert

in January 2009, reviewed Neubert's entire file. (AR at 806.) LINA asked Dr. Swales to answer

nine questions in his file review, four of which dealt with the value and reliability of Mr.

Schaus's neuropsychological testing:

> 2) Please review the tests and results of the testing performed by Mr. Harold Schaus, and comment on the tests that were administered. Specifically address how these tests are different than those conducted January 12, 2009.

> 3) Are the tests administered by Mr. Schaus an acceptable measure for determining a global impairment of functioning, please provide your rationale? [sic]

> 4) Does the testing from Mr. Schaus support a finding that Mr. Neubert has difficulties in divided attention and anxiety to an extent to impact his functionality?

> 5) Is the testing conducted by Mr. Schaus supported by measured validity testing, please provide your rationale? [sic]

(*Id.*) The other questions asked Dr. Swales to identify Neubert's restrictions and limitations, with

particular attention to Neubert's use of his hands and his anxiety disorder. (*Id.* at 806-07.) LINA

asked Dr. Swales to determine whether Neubert had a functional impairment as a result of any

organic process and whether the medical documents in Neubert's record revealed any impaired

functionality in mental and social abilities.[3] (*Id.*)

After review, Dr. Swales concluded that the tests administered by Mr. Schaus "do

not in themselves provide sufficient evidence of a cognitive disorder . . . that would interfere

with [Neubert's] ability to work, nor lead to any limitations." (AR at 815.) Further, Mr. Schaus's

---

[3] LINA provided Dr. Swales with the following list of mental and social abilities: ability to carry out activities of daily living; ability to focus and concentrate; short term memory; working memory and comprehension; intellectual capabilities; problem solving capabilities; higher-level executive functioning; ability to deal with change; ability to deal with everyday stressful situations; ability to multi-task; ability to understand, carry out, and follow instructions; ability to respond appropriately to instructions and questions; ability to function socially and relate interpersonally to others; ability to persist and maintain pace; ability to plan and sustain activities; ability to influence other people's opinions, attitudes and judgments; and ability to exercise good judgment and make decisions. (AR at 807.)

tests were "not an acceptable measure for determining a Global Assessment of Functioning[,]" were "not consistent with community or professional neuropsychology standards of a comprehensive neuropsychological evaluation[,]" and did not sufficiently "determine whether difficulties in divided attention and anxiety exist to an extent that impact upon Neubert's functionality." (AR at 816-17.) In total, Mr. Schaus's tests, according to Dr. Swales, had limited clinical applications.

Nor did Dr. Swales identify any restrictions or limitations in the medical documentation in Neubert's file. (AR at 815.) Neubert's medical records were "inconsistent with severe motor impairment" in his hands and, moreover, indicated no impaired functionality other than anxiety. (*Id*. at 818.) Finally, Dr. Swales concluded that Neubert suffered no impaired functionality in mental and social abilities. (*Id*. at 818-20.)

In addition to Dr. Swales's file review, LINA revisited on remand the vocational review conducted on February 19, 2009, which had identified three occupations in Neubert's labor market: sales engineer, project engineer, and production planner. (AR at 825.) On remand, the vocational review used the correct wage threshold of 80% of Neubert's covered earnings. (*Id*.) LINA determined that project engineer and production planner, both light duty occupations, were still appropriate. (*Id*.) In identifying these occupations, LINA "stipulate[d]" to the physical restrictions detailed by plaintiff's treating physician, Dr. Shah. (*Id*. at 231.)

D.  LINA's Decision on Remand

On August 8, 2012, LINA again denied benefits. (AR at 230.) LINA concluded that "the medical documentation does not support an impairment of such a severity as to preclude [Neubert] from performing the material duties of any occupation." (*Id*. at 231.) "Furthermore, any impairment that does exist is caused by or directly related to an anxiety

12

disorder for which benefits have been paid through the 24 month limitation contained in Mr. Neubert's policy under the Mental Illness, Alcoholism and Drug Abuse Limitation." (*Id*.)

        To support its decision, LINA relied on file reviews, physicians' opinions, and several articles, giving these materials greater weight than materials supporting Neubert's claim. LINA expressly relied on Dr. Swales's file review, as well as the revised vocational review. Unlike its previous denials, LINA on remand discredited the treating physicians' opinions that Neubert had cognitive impairments. According to LINA, these opinions were supported only by Neubert's self-reported symptoms, not clinical testing or observed behavior. (*Id*. at 231.) LINA also discredited the conclusions of Mr. Schaus, whose neuropsychological testing (the PASAT and IVA tests) had determined that Neubert could not return to work. (*Id*. at 232.) Here, LINA relied on Dr. Swales's refutation of Mr. Schaus's opinions and also cited a journal article evaluating the efficacy of the PASAT test:[4] Tom N. Tombaugh, *A Comprehensive Review of the Paced Auditory Serial Addition Test (PASAT),* 21 ARCHIVES OF CLINICAL NEUROPSYCHOLOGY 53 (2006). (*Id*. at 232, 778.) The article noted that the PASAT is dependent upon age, IQ, and math ability, does not readily detect malingering test-takers, and is extremely susceptible to practice efforts. (*Id*. at 796.) LINA cited a portion of the article's conclusion:

> the PASAT represents a reliable test that has legitimate but restricted clinical applications. As suggested above, a low score on the PASAT does not necessarily indicate or confirm the presence of neurological pathology. Perhaps the best way to characterize the PASAT is to state that it is a highly sensitive, non-specific test and care must be taken to identify the reasons underlying any low score before interpreting it as clinically significant.

(*Id*. at 232, 796.)

---

[4] The PASAT requires the participant to add a series of single digit numbers. (AR at 779.) If the numbers 3, 6, and 2 were presented to the participant, he must first respond with 9, the sum of 3 and 6, and then with 8, the sum of 6 and 2. If the next number in the sequence were 4, the participant would add the two most recent numbers, 2 and 4, and answer with 6. (*Id*.)

Having discredited the opinions of the treating physicians and Mr. Schaus, LINA gave "greater weight" to the opinions of Dr. Swales and Dr. Mendelssohn, which were "based on clinical observation, validated neuropsychological testing, and review of Mr. Neubert's entire medical file[.]" (*Id*. at 232.) Dr. Swales and Dr. Mendelssohn both opined that Neubert did not suffer from any cognitive deficit or impairment, with Dr. Swales concluding that any impairment "was the product of anxiety, rather than a true cognitive impairment." (*Id*.) LINA also relied on Dr. Swales's opinion that Neubert's anxiety did not rise to a level "that would interfere with his everyday functioning." (*Id*.)

LINA considered, but ultimately did not give great weight to, the SSA benefits award. While the Administrative Law Judge awarding benefits relied on evidence that "could reasonably be expected to produce the alleged symptoms[,]" LINA relied on the record as a whole, including clinical studies that were not part of the Social Security case. (*Id*. at 233.) LINA further noted that the Plan requirements for LTD benefits differ from the requirements for Social Security Disability benefits. (*Id*.)

Finally, LINA noted that playing World of Warcraft ("WoW"), a frequent activity of Neubert's, requires a level of cognitive ability inconsistent with his claimed impairments. (*Id*.) To support this conclusion, LINA relied on the findings of the Gains Through Gaming Lab, which focuses on improving the cognitive abilities of older adults through gaming. According to a Lab researcher, WoW "is a cognitively challenging game in a socially interactive environment that presents users with novel situations." (AR at 233, 722.) Playing WoW includes "multitasking and switching between multiple cognitive abilities such as memory and spatial manipulations[.]" (*Id*.) LINA concluded, therefore, that Neubert's purported limitations were

inaccurate because "the skills required for [WoW] . . . are outside the scope of what Nr. Neubert reports that he is capable." (AR at 233.)

Considering the entire file, LINA concluded that Neubert was not disabled under the Plan and was not entitled to any further benefits. After this decision, Neubert submitted additional medical materials, which LINA did not accept. (AR at 227.) LINA indicated that Neubert had exhausted all administrative levels of appeals (*id.*), and Neubert filed the instant action.

II.     Law and Analysis

A.  Standard of Review

An ERISA plan administrator's decision to deny benefits is reviewed *de novo*, unless the benefit plan grants the administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). When there is a clear grant of discretionary authority to the plan administrator under the terms of the plan, the court applies an arbitrary and capricious standard of review to the administrator's decision to deny benefits. *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1063-64 (6th Cir. 2014) (citations omitted). Here, the parties agree that the terms of the Plan grant discretionary authority to LINA, and the arbitrary and capricious standard of review applies. (*See* Doc. No. 23 at 1271; Doc. No. 24-1 at 1300.)

Described as the "'least demanding form of judicial review[,]'" the arbitrary and capricious standard entails extreme deference to the ERISA plan administrator. *McClain*, 740 F.3d at 1064 (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998)). In *McClain*, the Sixth Circuit cautioned that commonly invoked metaphors for the arbitrary and capricious standard—rubber stamping decisions and toothless review—must not eclipse the

15

standard itself. *Id*. Instead, a "'decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence.'" *Id*. at 1064-65 (quoting *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (further citations and quotation marks omitted)). If a "'reasoned explanation, based on the evidence'" supports the plan administrator's decision, the decision "'is not arbitrary or capricious.'" *Id*. at 1065 (quoting *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)). Most importantly, even if discrete acts by the plan administrator are arbitrary and capricious, the court asks only whether the *ultimate decision denying benefits* was arbitrary and capricious. *Id*. at 1066 (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002)).

Review is "limited to the administrative record[,]" *i.e.*, "'the facts known to the plan administrator'" at the time of the administrator's decision. *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 658 (6th Cir. 2013) (quoting *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996)). The court may consider evidence outside the administrative record only when it supports a procedural challenge, such as "an alleged lack of due process afforded by the administrator or alleged bias on its part." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring).

B.  Analysis

Because the Court may only determine whether the ultimate decision denying benefits was arbitrary and capricious, the Court must grant LINA's motion for judgment on the administrative record and deny plaintiff's. LINA's "full and fair review" was less than perfect. It repeated past mistakes, ignored portions of the Court's previous opinion, and appeared to have specifically ordered a selective file review on remand. Yet, constrained by the arbitrary and

16

capricious standard of review as laid out by the Sixth Circuit, the Court cannot say that LINA's ultimate decision denying benefits rose to the level of arbitrary and capricious. In its letter denying benefits on remand, LINA found that "any impairment that does exist is caused by or directly related to an anxiety disorder for which benefits have been paid through the 24 month limitation contained in Mr. Neubert's policy under the Mental Illness, Alcoholism and Drug Abuse Limitation."[5] (AR at 231.) A "'reasoned explanation, based on evidence[]'" supports LINA's conclusion that an anxiety disorder contributed to Neubert's disability; therefore, LINA's decision denying benefits was not arbitrary and capricious. *McClain*, 740 F.3d at 1065 (quoting *Shields*, 331 F.3d at 541).

The Court begins by describing the improper actions of LINA on remand. LINA gave "greater weight" to Dr. Swales and Dr. Medelssohn's opinions than the treating physicians' opinions, noting that only the former opinions were based on clinical observation and valid testing.[6] (AR at 232.) The Court has already determined that Dr. Mendelssohn's review "lacks a reasoned analysis." *Neubert*, 2012 WL 776992, at *17. Her file review ignored evidence of

---

[5] This section provides:

> We will pay Monthly Benefits on a limited basis for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 Monthly Benefits have been paid, no further benefits will be payable for any of these conditions.
> 1.       Alcoholism
> 2.       Anxiety disorders
> 3.       Delusional (paranoid) disorders
> 4.       Depressive disorders
> 5.       Drug addiction or abuse
> 6.       Eating disorders
> 7.       Mental illness
> 8.       Somatoform disorders (psychosomatic illness)

(AR at 1203.)

[6] By stating that Dr. Mendelssohn *and* Dr. Swales's opinions were "based on clinical observation, validated neuropsychological testing, and review of Mr. Neubert's entire medical file[,]" LINA gives the impression that Dr. Mendelssohn examined Neubert personally. (AR at 232.) This is not the case. Dr. Mendelssohn "defer[red] to the neuropsychological evaluation conducted" by Dr. Swales in her file review and has never examined Neubert. (*Id.*)

17

Neubert's cognitive difficulties and used a global impairment standard not defined in the record or the Plan. *Id*. Dr. Mendelssohn's file review did not acquire a reasoned analysis on remand.

The vocational review conducted on remand ignored the Court's previous opinion, in which the Court noted:

> [t]he vocational review identifies three occupations that are classified as light duty work, 20 C.F.R. § 404.1567(b), despite Dr. Shah's report that Neubert is only occasionally able to walk or stand, which would indicate sedentary work, 20 C.F.R. § 404.1567(a). In its first denial letter, LINA does not explain the discrepancy between Dr. Shah's analysis and that of the vocational review. What is more, the vocational review indicates, 'no consideration [was] taken for any cognitive deficits' (AR 699), presumably, because Dr. Swales did not find any cognitive impairment; however, as outlined above, no explanation is given for rejecting the differing conclusions reached by Neubert's treating physicians.

*Neubert*, 2012 WL 776992, at *15. While Dr. Shah limited Neubert to occasional walking and standing, to which LINA purportedly stipulated, the second vocational review inexplicably produced two light duty occupations—project engineer and production planner—both of which "[c]an include walking and or standing frequently[.]" (AR at 803, 805.) After four years of analysis and evaluation, LINA has not identified even one occupation in Neubert's labor market that accommodates his restrictions and limitations. LINA's failure to conduct a vocational review in compliance with either the Court's previous opinion or its own stated standards is disturbing to the Court.

Though the Court required LINA to perform a "full and fair review" of Neubert's file on remand, when LINA asked Dr. Swales to conduct a full file review, four of its nine questions dealt exclusively with Mr. Schaus's neuropsychological tests, among the strongest evidence supporting Neubert's disability. (AR at 806-07.) LINA did not require or request such exacting analysis relative to any other testing or medical opinion.

18

These problems notwithstanding, LINA's ultimate decision denying benefits relied on ample record evidence that Neubert's anxiety disorder contributed to his disability. The record is replete with references to Neubert's anxiety. On January 22, 2009, Dr. Swales noted that Neubert "endorsed criteria currently for a generalized anxiety disorder following the stroke in that he is frequently restless, easily fatigued, and has concentration difficulties and irritability, as well as neck tension and sleep difficulties, all related to his worries." (AR at 464.) Neubert told Dr. Swales that "[a]nxiety is an issue." (*Id*.) Dr. Swales ultimately concluded that Neubert "meets criteria for an Anxiety Disorder Not Otherwise Specified (DSM-IV 300.00)" and that "[h]is cognitive complaints appear to be the product of anxiety, rather than true cognitive impairment." (*Id*. at 472-73.) Dr. Swales did caution that the anxiety disorder could be "organically-based[,]" *i.e.*, a result of Neubert's past strokes. (*Id*. at 473.)

Asked to describe his limitations, Neubert repeatedly cited his anxiety as one of the primary mental problems preventing him from working. In a November 2008 email, Neubert writes, "the primary mental problems preventing me from working are: . . . [o]verload and stress out to point of crippling anxiety . . . ." (*Id*. at 513.) In documents submitted to LINA describing his disability, Neubert again detailed the primary physical and/or mental conditions preventing him from working: "constant burning in right arm and leg along with severe neck pain that forces [him] to lie down, *anxiety problems*, unable to focus or multitask, and memory problems due to permanent brain damage from stroke. This also causes fatigue and lack of stamina." (*Id*. at 518; *see also id*. at 592, 720.)

Neubert's treating physicians frequently remarked on Neubert's anxiety, particularly anxiety about returning to work and performing satisfactorily at work. (*See, e.g.*, *id*. at 683, 937, 972, 975, 977, 979, 986, 1033.) Even Mr. Schaus, a strong supporter of Neubert's

claim of cognitive impairments, believed that Neubert has "psychological dysfunction in the mild to moderate range of severity[,]" specifically, generalized anxiety disorder and an adjustment disorder with depressed mood. (*Id*. at 884.) While Mr. Schaus believed that Neubert's cognitive defects alone rendered him "unlikely" to return to work, he also noted that, when combined with the emotional problems, "it is a real long shot that he could resume his duties at Lockheed." (*Id*. at 886.)

In particular, the file review performed by Dr. Swales on remand highlighted Neubert's anxiety disorder. First, Dr. Swales recalled his own January 22, 2009 evaluation of Neubert, in which he concluded that Neubert's main problem was anxiety disorder. (*Id*. at 807.) Dr. Swales cited ample record evidence to show he was not alone in this opinion. He noted that Mr. Schaus diagnosed Neubert with anxiety disorder (*id*. at 808), and that Neubert's treating physician, Dr. Salay, remarked on Neubert's anxiety (*id*. at 810), as did Dr. Parmar, another treating physician. (*Id*. at 813.) After reviewing the file, Dr. Swales found "no other indication of a limitation to Mr. Neubert's functionality other than his anxiety." (*Id*. at 818.) Substantial evidence supported Dr. Swales's opinion, and LINA's reliance on his opinion, as well as the rest of the record evidence of Neubert's anxiety disorder, was reasonable. Under the Plan's plain language, once LINA determined that Neubert's anxiety disorder "contributed to" his disability, LINA had no duty to pay disability benefits beyond twenty-four months. (*Id*. at 1203.)

Courts considering similar mental disorder limitations in ERISA plans have upheld benefits denials. For example, when an ERISA plan capped benefits for disabilities "caused by or contributed to by mental or nervous disorders[,]" a district court held that plaintiff's anxiety disorder contributed to her disability, even though it was caused by her medical condition. *Guo v. Reliance Standard life Ins. Co.*, No. 08-11027, 2009 WL 2386084, at

*6 (E.D. Mich. July 30, 2009). Because the plan language did not differentiate between nervous disorders caused by medical conditions and those caused by psychological conditions, the court held that capping benefits under the limitation for a medically-induced nervous disorder was not arbitrary and capricious. *Id.* at *8; *see also Atkins v. Guardian Life Ins. Co. of Am.*, 969 F. Supp. 2d 788, 798 (E.D. Ky. 2013) (applying plan's special limitation provision regarding mental or nervous conditions); *Neely v. Metro. Life Ins. Co.*, 326 F. Supp. 2d 871, 875 (W.D. Tenn. 2004) (limiting benefits under mental disorder limitation provision when "ample evidence" of depression); *Laird v. Metlife Life & Accident Ins. Co.,* No. 08-13075, 2009 WL 2496491, at *22 (E.D. Mich. Aug. 17, 2009) (concluding that plaintiff's disability resulted from major depressive disorder, not organic brain syndrome, an exception to the plan's mental disorder limitation).

Under this Plan, disabilities caused by or contributed to by "anxiety disorders" are limited to twenty-four months of benefits. The plain terms of the Plan do not exempt from the twenty-four month limitation anxiety disorders caused by strokes or other medical conditions. Nor do the plain terms of the Plan require the anxiety disorder to be the main or overriding contributing factor to the disability. It was not arbitrary and capricious, therefore, for LINA to determine that Neubert suffered from an anxiety disorder and that his anxiety disorder contributed to his disability. Because a reasoned explanation based on evidence in the record supports this conclusion, the Court may not second guess LINA's decision terminating benefits after twenty-four months.

III.     Conclusion

Though LINA's treatment of Neubert's claim for disability benefits on remand fell far short of perfect, its ultimate decision denying benefits was rational, supported by record

21

evidence, and not arbitrary and capricious. Accordingly, defendant's motion for summary judgment is GRANTED and plaintiff's motion for summary judgment is DENIED.


**IT IS SO ORDERED**.

Dated: July 21, 2014

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**